# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

Reverend Stephen Jarrard and
Ollie Morris,

                Plaintiffs,

                                Case No. 4:20-cv-2-MLB

v.

Sheriff Johnny Moats, Chief
Deputy Al Sharp, and Deputy
Dustin Strop, individually and in
their official capacities,

                Defendants.

_____/

## **OPINION & ORDER**

Plaintiffs Ollie Morris and Reverend Stephen Jarrard sued Defendants Sheriff Johnny Moats, Chief Deputy Al Sharp, and Deputy Dustin Strop for banning inmate baptism at the Polk County Jail and for preventing Plaintiff Jarrard from ministering in the Jail. Defendants now move to dismiss for lack of subject matter jurisdiction and for failure to state a claim. (Dkt. 18.) The Court grants Defendants' motion in part and denies it in part.

## I.   Background[1]

Plaintiff Jarrard is an Evangelist for the Church of Christ.  (Dkt. 16 ¶ 1.)  He regularly ministers to inmates in jails and prisons.  (*Id.* ¶¶ 7–8.)  He believes baptism by immersion is necessary for salvation. (*See id.* ¶ 18.)  Defendant Moats is the Sheriff of Polk County.  (*Id.* ¶ 3.) Defendants Sharp and Strop are deputies in the Polk County Sheriff's Office.  (*Id.* ¶ 4.)  Plaintiff Morris is a former inmate at the Jail.  (*Id.* ¶ 2.)

In 2014, Plaintiff Jarrard began ministering to inmates in Polk County Jail.  (*Id.* ¶ 9.)  Jail officials expelled him five months later after other ministers complained "regarding [his] teaching about baptism." (*Id.* ¶ 14.)  The Jail let him return in December 2015.  (*Id.*)

In February 2016, the Jail issued a written policy governing "religious services" ("2016 Policy").  (Dkt. 16-2.)  The policy said (among other things) that "[r]eligious rituals such as baptism and wedding ceremonies will not be conducted for inmates, as the Polk County Jail is a short term facility."  (*Id.* at 4.)  Despite this language, the Jail allowed

---

[1] Plaintiffs' complaint is often unclear, imprecise, and confusing.  The Court, with great frustration, has read and re-read it several times in an effort to understand it and do it justice.  To the extent the Court has failed to accurately divine its intended meaning in any respect, the responsibility for that failure lies with Plaintiffs alone.

Plaintiff Jarrard to baptize two inmates in late 2016 using a horse trough filled with water. (Dkt. 16 ¶¶ 11–12.) Jail officials were present for both baptisms, with each lasting about ten minutes. (*Id.* ¶ 13.)

In January 2017, Defendant Sharp told Plaintiff Jarrard (1) he could no longer teach inmates that baptism is "an essential part of the doctrine of Christ" and (2) if any other inmates requested baptism, he "would be excluded from coming into the jail as [a] volunteer minister[]." (Dkt. 16-1 at 2.) Jail officials made good on this threat just a few days later, telling Plaintiff Jarrad "he could no longer come into the facility as too many inmates had requested baptism." (Dkt. 16 ¶ 15.) About 26 inmates were actively seeking baptism at the time. (*Id.* ¶ 16.) Defendant Sharp told these inmates that, "as baptism was not required for their salvation, the facility would not provide that service." (*Id.* ¶ 17.)

In June 2017, the Jail issued a new "religious services" policy that made no explicit reference to baptism ("2017 Policy"). (Dkt. 18-1.) It is unclear whether this policy *replaced* or *supplemented* the 2016 Policy but, either way, the Jail's baptism ban remained in place at least as a matter

of practice.[2]  For example, when Plaintiff Morris asked to be baptized in February 2018, Defendant Strop told him "we don't do baptisms or other religious rituals here."  (Dkt. 16 ¶ 49.)  Plaintiff Morris appealed, but Defendants Sharp and Moats upheld the decision on the ground that "inmates at Polk County Jail will not participate in religious rituals."  (*Id.* ¶¶ 51–52.)  The Jail also denied baptism requests from other inmates. (*Id.* ¶ 53.)

In June 2018, Plaintiff Jarrard sent Defendant Moats a letter expressing interest in returning to the Jail as a volunteer minister.  (Dkt. 16-1 at 3.)  It is unclear whether Defendant Moats ever responded but, either way, Plaintiff Jarrard did not resume his ministry in the Jail.[3]

---

[2] Defendants' brief claims the 2017 Policy "replaced" the 2016 Policy. (Dkt. 18-2 at 2.)  But the complaint suggests otherwise.  (Dkt. 16 ¶ 19.) And, unlike the Jail's other policy documents, the 2017 Policy does not say it "rescinds all other policies prior to date of issue."  (*Compare* Dkt. 18-1 at 1, *with* Dkt. 16-2 at 2 and Dkt. 16-5 at 1.)

[3] The complaint alleges—without elaboration, explanation, or context— that Plaintiff Jarrard "reapplied, but [his] application was denied."  (Dkt. 16 ¶ 32.)  The Court has no idea what this means.  Perhaps the June 2018 letter is the "application" that Defendants rejected.  But the Court cannot reach even this limited conclusion given Plaintiffs' own confusing and contradictory allegations.  (*See* Dkt. 23 at 11 (stating the reapplication and denial occurred in 2017); *see also* Dkts. 16 ¶ 79 (suggesting that, after Plaintiff Jarrard was barred from the Jail in 2017, Defendants denied his application for re-entry only once in 2020); 16-6 at 3 (suggesting Plaintiff

In April 2019, Plaintiffs sent Defendant Moats a letter threatening to sue over the Jail's baptism ban and Plaintiff Jarrard's expulsion from the Jail's ministry program. (Dkt. 16 ¶ 54.) Defendant Moats replied the next month, characterizing Plaintiffs' claims as "exaggerated and mostly false." (Dkt. 16-4 at 2.) Defendant Moats explained that (1) Plaintiff "Jarrard was barred from the Polk County Jail, not because of his insistence on baptizing inmates, but because of his disruptive behavior toward other members of the jail ministry program that did not share his radical religious views"; and (2) "[o]ur stance is since the Polk County Jail is a short term detention center, baptism can wait until after release since it is not a requirement for salvation." (*Id.* at 2–3.)

Plaintiffs filed this lawsuit in January 2020 challenging the Jail's baptism ban and Plaintiff Jarrard's expulsion from the Jail. (Dkt. 1.) Two months later, the Jail issued a new "religious services" policy ("2020 Policy"), which superseded all prior policies. (Dkt. 16-5.) The new policy says nothing specific about baptism but establishes a process for inmates to request "rites that are integral [to] their religious faith." (*Id.*

---

Jarrard submitted jail ministry applications only in 2012, 2015, and 2020).)

at 1.)  Under this process, (1) the inmate must submit the request; (2) the Jail will discuss the request with "a local cleric of the inmate's professed religion"; (3) the Jail considers "the security concerns based upon the inmate's classification and housing assignment"; and (4) "[a]fter evaluation of the cleric's guidance and security concerns," the Jail will grant the request "to the extent that [doing so] will not jeopardize the safety, security, and good order of the facility." (*Id.* at 1–2.)

The 2020 Policy also describes the circumstances under which "clergymen and religious advisors [may] hold services or conduct programs in the jail." (*Id.* at 2; *see also* Dkt. 18-1 at 2.)  The clergymen or religious advisors "must make written application to the Polk County Sheriff's Office with supporting documentation, attend a training session and then be approved by the Jail Administrator." (Dkt. 16-5 at 2; *see also* Dkt. 18-1 at 2.)  The policy does not say how the Jail Administrator will decide whether to approve an application.  But the Jail's application form does say applicants must comply with certain "guidelines" during their jail ministry, including "don't use profane language," "don't carry contraband," and "don't take sides against authority." (Dkt. 16-6 at 2, 4.)  At the end of the form, applicants must certify: "I understand that if I

6

violate any of the [guidelines] listed that my volunteer status can be terminated and that, in some instances, I can be criminally charged." (*Id.* at 4.)

In April 2020, Plaintiff Jarrard submitted a written application to volunteer in the Jail as a "chaplain/Bible teacher/councelor [sic]." (*Id.* at 3.) The Sheriff's Office denied his application the next month on the ground that he "has a history of being involved in contentious behavior and conflict" both in Polk County Jail and other regional jails. (Dkt. 16-7 at 2.) The Sheriff's Office said its decision had "no relationship to the existence of pending litigation or any religious doctrinal consideration." (*Id.* at 1.)

Shortly thereafter, Plaintiffs filed an amended complaint asserting three counts against Defendants in their individual and official capacities. Count 1 claims Defendants violated Plaintiff Morris's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when it banned inmate baptisms during his incarceration. (Dkt. 16 ¶¶ 60–66.) Count 2 claims Defendants violated both Plaintiffs' First Amendment rights by banning inmate baptisms at the Jail. (*Id.* ¶¶ 67–73.) And Count 3 alleges Defendants violated Plaintiff Jarrard's

First Amendment rights by retaliating against him when it precluded him  from ministering in the Jail "because of the baptism issue." (*Id.* ¶¶ 75–83.)  Both Plaintiffs seek damages arising from the Jail's baptism ban. (*Id.* ¶¶ 66, 71.)  Plaintiff Jarrard also seeks equitable relief to ensure he can resume his jail ministry and perform baptisms in the Jail. (*Id.* ¶¶ 70, 83.)[4]

Defendants move to dismiss for lack of subject matter jurisdiction and for failure to state a claim.  Defendants seek dismissal under several theories, including standing, mootness, sovereign immunity, statute of limitations, qualified immunity, and failure to state a claim.

## II.   Legal Standards

### A.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint."  *McElmurray v. Consol. Gov't of*

---

[4] Plaintiff Morris does not seek equitable relief. (*See* Dkt. 23 at 1.)  Nor could he since he is no longer an inmate at the Jail.  *See Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) ("The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief.").

*Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* Defendants lodge a facial attack here. (*See, e.g.*, Dkt. 18-2 at 2 n.2.)

**B.     Motion to Dismiss for Failure to State a Claim**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility of misconduct." *Id.* at 679. The plaintiff's well-pled allegations must "nudge[] [his] claims across the line from

conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In making this plausibility determination, the court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010). But the court need not credit "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004). In other words, "labels and conclusions" are disregarded, and "formulaic recitation[s] of the elements of the cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

## III. Count 1

In Count 1, Plaintiff Morris seeks damages under the RLUIPA for "being denied the right to participate in a baptism." (Dkt. 16 ¶ 66.) He asserts this claim against Defendants only in their official capacities. (Dkt. 23 at 22); *see also Koepke v. Jacksonville Sheriff's Dep't*, 2020 WL 1083712, at *3 (M.D. Fla. Mar. 6, 2020) ("[I]ndividual capacity RLUIPA

claims are not cognizable."). Defendants say the claim is barred by sovereign immunity. The Court agrees.

"Claims against an individual officer in his [or her] official capacity are really claims against the entity he [or she] represents." *Robinson v. Ash*, 374 F. Supp. 3d 1171, 1186 (M.D. Ala. 2019). Defendants here are a *county* sheriff and two of his deputies. But they acted as *state* representatives when they denied Plaintiff Morris's request to be baptized in the Jail. *See Lake v. Skelton*, 840 F.3d 1334, 1344 (11th Cir. 2016) (deputy sheriff acted as arm of the state when he denied an inmate's religious dietary request); *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1325 (11th Cir. 2005) ("[A] sheriff's authority and duty to administer the jail in his jurisdiction flows from the State, not the County," including "when promulgating policies and procedures governing conditions of confinement at [a] County Jail"). This means Plaintiff Morris essentially brings his RLUIPA claim for damages against the State of Georgia.

"Absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d

1268, 1289 (11th Cir. 2013).   This bar is jurisdictional.   *See Omanwa v. Catoosa Cnty.*, 711 F. App'x 959, 961–62 (11th Cir. 2017) ("The Eleventh Amendment prohibits federal courts from exercising subject matter jurisdiction over a lawsuit against a state.").   Georgia has not waived immunity for RLUIPA suits.   *See Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA.").   Nor has Congress abrogated that immunity.   *See Barnes v. Carani*, 2018 WL 703424, at *6 (S.D. Ga. Feb. 2, 2018) ("[S]overeign immunity applies in the RLUIPA context.").   So sovereign immunity applies here.   *See id.* ("Sheriff and Deputy Sheriffs[] are entitled to sovereign immunity from Plaintiff's religious diet claims for monetary damages" under the RLUIPA); *Daker v. Warren*, 2013 WL 12164722, at *5 (N.D. Ga. Jan. 30, 2013) ("Plaintiff may not sue [a Georgia Sheriff] for damages under RLUIPA in the Sheriff's official capacity.").

Plaintiff Morris does not really dispute any of this.   He instead claims sovereign immunity does not bar *nominal* damages, even if it bars other types of damages.   (Dkt. 23 at 22.)   That is wrong.   *See Simmons*

*v. Conger*, 86 F.3d 1080, 1086 (11th Cir. 1996) ("[T]he district court erred in awarding nominal damages against [defendant] in his official capacity because that relief is barred by the Eleventh Amendment."); *Freeman v. Sample*, 2018 WL 11216972, at *7 (M.D. Ga. June 1, 2018) ("[B]ecause the Court agrees the State has sovereign immunity against RLUIPA claims, [plaintiff] may not proceed on a claim for nominal damages."); *Jones v. Coonrod*, 2018 WL 855620, at *5 (N.D. Fla. Jan. 24, 2018) ("The Eleventh Amendment bars any monetary damage against the State, including both compensatory and punitive damages, as well as nominal damages."); *Cowen v. Kemp*, 2018 WL 8141305, at *2 (N.D. Ga. Jan. 25, 2018) (sovereign immunity bars official capacity claim for nominal damages).[5]

---

[5] *See also Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 n.7 (1st Cir. 2013) ("[A] claim for nominal damages is foreclosed by [defendant's] sovereign immunity."); *Doe v. Comm'r, N.H. Dep't of Health & Human Servs.*, 2021 WL 27009, at *4 (D.N.H. Jan. 4, 2021) ("[S]overeign immunity from suit . . . includes a bar against nominal damages."); *Fluker v. King*, 2015 WL 1195678, at *2 (S.D. Miss. Mar. 13, 2015) ("Even nominal and punitive damages are precluded by Eleventh Amendment sovereign immunity."); *Sanders v. Cain*, 2013 WL 1335746, at *3 (M.D. La. Apr. 1, 2013) ("[T]he recovery of even nominal or punitive damages from the defendants in their official capacities is precluded by Eleventh Amendment sovereign immunity."); *H.B. Rowe & Co. v. Conti*, 2011 WL 13291270, at *3 (E.D.N.C. Feb. 23,

Because Plaintiff's RLUIPA claim is barred by sovereign immunity, the Court dismisses Count 1 for lack of subject matter jurisdiction.

## IV.   Count 2

### A.   Plaintiff Morris

In Count 2, Plaintiff Morris claims the Jail banned inmate baptisms—and denied his own request for baptism—in violation of the First Amendment.   He seeks damages from Defendants in their individual capacities.  (*See* Dkt. 23 at 1, 3 n.4.)  Defendants say qualified immunity bars this claim.  The Court disagrees, at least at this early stage of the case.[6]

#### 1.   Legal Principles

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional

---

2011) ("Sovereign immunity bars [plaintiff's] recovery of nominal damages against any of the named Defendants.").

[6] Count 2 does not seek damages from Defendants in their *official* capacities.  (*See* Dkt. 23 at 3 n.4.)  Even if it did, sovereign immunity would bar recovery for the reasons explained in the Court's discussion of Count 1.  Official capacity damages are also unavailable under Count 2 because "[a] state, a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983."  *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995).

14

rights of which a reasonable person would have known." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018).  An official asserting this defense must show that he "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  The burden then "shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.*  This requires the plaintiff to show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*  To make this showing, the plaintiff must demonstrate "the preexisting law was so clear that, given the specific facts facing a particular officer, one must say that every reasonable official would have understood that what he [or she] is doing violates the Constitutional right at issue." *Gates*, 884 F.3d at 1302.  "The critical inquiry is whether the law provided [defendants] with fair warning that their conduct violated the [Constitution]." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).  "It is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if the complaint fails to allege the violation of a

clearly established constitutional right." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003).

### 2.    Analysis

Plaintiff Morris does not—and could not—dispute that Defendants acted within their discretionary authority when they established the baptism ban and applied it to him. *See, e.g.*, *Shabazz v. Morales*, 2019 WL 4737585, at *4 (correctional officer "was acting in his discretionary authority when he ordered Plaintiff to comply with the [prison] grooming policy" that allegedly violated plaintiff's First Amendment rights). So, to avoid qualified immunity, he must show Defendants' baptism ban violated clearly established law.

"The First Amendment of the United States Constitution prohibits prison officials from imposing a substantial burden on the free exercise of an inmate's sincerely held religious belief unless their actions or restrictions are reasonably related to legitimate penological interests." *Sajous v. Withers*, 2018 WL 10151942, at *6 (S.D. Fla. Jan. 16, 2018); *see Robbins v. Robertson*, 782 F. App'x 794, 801 (11th Cir. 2019) ("To state a claim under the First Amendment's Free Exercise Clause, a plaintiff must plead facts showing a substantial burden on a sincerely held

religious belief."); *Prison Legal News v. McDonough*, 200 F. App'x 873, 877 (11th Cir. 2006) ("[A] prison's restriction on First Amendment rights is permissible if it is reasonably related to legitimate penological interests."). "[A]n individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *see Hoever v. Belleis*, 703 F. App'x 908, 912 (11th Cir. 2017) (same). Courts apply a four-prong test—known as the *Turner* test—to determine whether a regulation is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The test asks "(1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether

the regulation represents an exaggerated response to prison concerns." *Johnson v. Brown*, 581 F. App'x 777, 780 (11th Cir. 2014).

Plaintiff Morris has pled a plausible First Amendment claim under these standards. The complaint alleges, and Defendants do not dispute, that he sincerely believes he must be baptized by immersion and this counts as a "sincerely held religious belief." *Robbins*, 782 F. App'x at 801; (*see* Dkt. 16 ¶¶ 49, 51). The Jail's baptism ban "substantially burdened" his exercise of this belief because it "completely prevent[ed]" him from "engaging in religiously mandated activity." *Hoever*, 703 F. App'x at 912. And Plaintiffs plausibly allege the ban was *not* "related to legitimate penological interests" because they say it was animated by Defendants' own religious views—a decidedly illegitimate interest for government employees to pursue. *See McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (First Amendment bars government from "[m]anifesting a purpose to favor one faith over another").

Indeed, Plaintiffs allege Defendants openly disclosed their illicit policy rationale on several occasions. In January 2017, Defendant Sharp told inmates that, "as baptism was not required for their salvation, the facility would not provide that service." (Dkt. 16 ¶ 17.) And, in a striking

admission more than two years later, Defendant Moats told Plaintiffs *in writing* (while under the specter of litigation): "Our stance is since the Polk County Jail is a short term detention center, baptism can wait until after release since it is not a requirement for salvation." (Dkt. 16-4 at 3.) The complaint suggests no other rationale for the ban. Perhaps discovery will do so, but, at this juncture, the Court can only consider what is in the complaint. And the complaint pleads a plausible violation of Plaintiff Morris's First Amendment rights.

Furthermore, those rights were "clearly established" at the time of the alleged violation. Although Plaintiff Morris cites no materially similar binding precedent in support of his claim, this is one of those rare cases where Defendants' alleged conduct violates the First Amendment "as a matter of obvious clarity." *Coffin*, 642 F.3d at 1014. No reasonable officer could think it is lawful to ban baptism, including for those who believe baptism is essential for salvation, simply because the officer personally holds a different religious view. Such a ban would obviously fail the *Turner* and "substantial burden" tests, both of which are clearly established in the caselaw. *See Gates*, 884 F.3d at 1296 ("[A] judicial precedent with identical facts is not essential for the law to be clearly

established.   Authoritative judicial decisions may establish broad principles of law that are clearly applicable to the conduct at issue.").

Defendants do not seriously suggest otherwise.  They baldly assert in moving to dismiss that "[t]he trouble is with baptisms that involve large tubs of water in a facility that is not designed to accommodate this type of ritual with safety and security."  (Dkt. 18-2 at 12.)   This "generalized" reference to "security interests"—found in a legal brief rather than any pleading or record evidence—is too vague to permit meaningful application of the *Turner* test, especially at this early stage of the litigation.  *Profit v. Rabon*, 2020 WL 687590, at *4 (N.D. Fla. Jan. 9, 2020); *see also Daker v. Warren*, 660 F. App'x 737, 744 (11th Cir. 2016) (defendant's "two sentence[]" affidavit—containing "blanket and conclusory" justifications for a prison policy—was insufficient to entitle defendant to summary judgment under *Turner*).  The *Turner* test is a "fact-intensive inquiry" that, in most cases, "can only be resolved at the summary judgment stage or at trial."   *Garber v. Conway*, 2016 WL 11545539, at *4 n.3 (N.D. Ga. Apr. 19, 2016); *see Bennett v. Langford*, 2018 WL 9538769, at *2 (N.D. Ga. Jan. 22, 2018) (referencing "the fact-intensive nature of the *Turner* test").   Defendants' single-sentence

20

assertion in their brief does not take them outside the normal rule. "[T]he facts surrounding the defendants' justification for their alleged interference with [Plaintiff Morris's] religious practices must still be developed before a determination can be made as to whether the defendants acted reasonably." *Johnson*, 581 F. App'x at 781; *see Profit*, 2020 WL 687590, at *3–5 ("The parties will . . . need to develop a record before the Court can engage in the proper *Turner* inquiry.").

This factual development is especially important here because Plaintiffs' complaint affirmatively undermines Defendants' purported security concerns.   According to the complaint, Plaintiff Jarrard performed two baptisms at the Jail in 2016 "without any incident or concern." (Dkt. 16 ¶ 11.)  Both baptisms took place "with jail officials and guards in full view." (*Id.* ¶ 13.)  And each baptism lasted no more than ten minutes. (*Id.*)  Plaintiffs also allege that other jails "across the United States"—including in Georgia—have allowed inmates to be baptized by immersion.   (*Id.* ¶¶ 21–22, 42.)   All of this casts doubt on the reasonableness of Defendants' blanket baptism ban.

Because Plaintiff Morris plausibly alleges a violation of clearly established First Amendment law, his claim for damages under Count 2 may proceed.

### B.   Plaintiff Jarrard

In Count 2, Plaintiff Jarrard also asserts a First Amendment challenge to the Jail's baptism ban.  He seeks damages from Defendants in their individual capacities, a declaration that the ban is unconstitutional, a "permanent injunction preventing future enforcement" of the ban, and an injunction allowing Plaintiff Jarrard to perform baptisms in the Jail "subject to reasonable and constitutional restrictions."  (*Id.* at 17, 19.)  Defendants move to dismiss on the grounds that Plaintiff Jarrard fails to state a claim, his damages request is untimely and barred by qualified immunity, and he lacks constitutional standing to seek the equitable relief he wants.  The Court agrees with Defendants on all counts.

#### 1.   Plaintiff Jarrard Fails to State a Claim

Plaintiff Jarrard concedes that, under the First Amendment, he "has no right to involvement in Jail activities or access to provide religious services to inmates at the Jail."  (Dkt. 23 at 2); *see O'Malley*

22

*v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973) ("[A] clergyman [lacks] a First Amendment right . . . to conduct religious services and offer religious counsel in a state institution."); *McCollum v. California*, 2006 WL 2263912, at *3 (N.D. Cal. Aug. 8, 2006) ("[C]lerics do not have a First Amendment right to minister to prisoners."). This concession is fatal to his claim because, if he has no First Amendment right to perform baptisms in the Jail, then his "inability . . . to perform [those] baptisms" cannot violate the First Amendment. (Dkt. 16 ¶ 71.) "[T]he state cannot be charged with denying that which does not exist." *O'Malley*, 477 F.2d at 793.

Plaintiff Jarrard essentially "asserts not his own rights, but the free exercise of prison inmates." *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 879 (9th Cir. 2011). That is so because any purported "right to [baptize] inmates is derivative of the inmates' rights to have access to a [baptism] of their faith." *Id.*; *see Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (recognizing chaplaincies may be part of prison efforts to offer "reasonable opportunities . . . to all prisoners to exercise the[ir] religious freedom"). Nothing in the record suggests Plaintiff Jarrard has the third party standing required to assert this "derivative" right on behalf of

inmates at the Jail.  Indeed, to do so, he must show (among other things) that inmates are "impeded from asserting their own claims." *McCollum*, 647 F.3d at 879; *see Harris v. Evans*, 20 F.3d 1118, 1124 (11th Cir. 1994) (third party standing requires an "impediment to the ability of the [right-holder] to assert [his or her] own First Amendment rights").  He cannot make that showing here, including because an inmate (Plaintiff Morris) asserts a near-identical claim in the very same lawsuit.  *See McCollum*, 647 F.3d at 879 (chaplain lacked standing to bring claim on behalf of inmates where the inmates brought a similar claim of their own "in this very lawsuit").  Plaintiff Jarrard's challenge to the baptism ban under Count 2 must be dismissed for failure to state a claim.

## 2.    Plaintiff Jarrard's Request for Damages

To the extent Plaintiff Jarrard seeks damages under Count 2, his claim is also barred by qualified immunity and the statute of limitations. Qualified immunity applies because, even assuming the baptism ban somehow violated Plaintiff Jarrard's rights under the First Amendment (despite authority to the contrary), the existence of those rights is far from clear.  Indeed, it is nearly the polar opposite of Plaintiff Morris's claim.  While the denial of Plaintiff Morris's right to a baptism based on

24

a government official's contrary religious beliefs is a "matter of obvious clarity," case law seems to clearly establish Plaintiff Jarrard had no equivalent constitutional right to perform that service in the Jail, let alone a clearly established right to do so. That is enough to trigger qualified immunity. *See Malcolm v. City of Miami Police*, 574 F. App'x 881, 882–83 (11th Cir. 2014) ("[T]he federal violation must have been beyond debate at the time; otherwise qualified immunity applies. When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.").

As for the statute of limitations, Plaintiff Jarrard can only claim baptism ban damages for the period in which he was actually subject to that ban. That period expired in January 2017 when he was expelled from the Jail. Accepting Plaintiff Jarrard's allegations as true, after that date, he was prevented from performing baptisms at the Jail, not because of the alleged ban at issue in Count 2, but rather because Defendants excluded him from any ministry at the Jail. "The statute of limitations for 42 U.S.C. § 1983 actions filed in Georgia is two years." *Prince v. Shepard*, 2017 WL 6944532, at *1 (N.D. Ga. Dec. 14, 2017). So Plaintiff Jarrard had two years from January 2017 to bring his claim. *See Jones*

*v. Union City*, 450 F. App'x 807, 809 (11th Cir. 2011) ("[T]he statute of limitations for § 1983 claims begins to run when facts supporting the cause of action are or should be reasonably apparent to the claimant."). Because he waited three years, his claim for damages is untimely.[7]

### 3.   Plaintiff Jarrard's Request for Equitable Relief

To the extent Plaintiff Jarrard seeks declaratory and injunctive relief under Count 2, his claim fails for the additional reason that he lacks standing under Article III of the Constitution.

### a)   Article III Standing

"Article III of the Constitution limits federal courts to adjudicating actual 'cases' and 'controversies.'"  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).  The doctrine of standing "constitutes the core of Article III's case-or-

---

[7] Plaintiff Jarrard argues the Court should apply the continuing violation doctrine to make his claim timely.  Under that doctrine, a plaintiff can sue for actions that occurred outside the applicable limitations period if a defendant's conduct is part of a continuing practice and the last act evidencing the continuing practice falls within the limitations period. *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001)).  Because Plaintiff Jarrard suffered no alleged injury as a result of the alleged ban on baptisms after he was excluded from the Jail altogether, the continuing violation doctrine offers him no relief from the statute of limitations.

controversy requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998); *see A&M Gerber Chiropractic*, 925 F.3d at 1210 ("Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing."). "Standing cannot be waived or conceded by the parties, and it may be raised (even by the court *sua sponte*) at any stage of the case." *A&M Gerber Chiropractic*, 925 F.3d at 1210. Courts "have always insisted on strict compliance with [the] jurisdictional standing requirement." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "The plaintiff bears the burden of establishing each element." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1268 (11th Cir. 2019). And plaintiff must meet that burden "for each claim he seeks to press and for each

27

form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

Courts "should not speculate concerning the existence of standing, nor should [they] imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005).  In other words, "[i]t is not enough that [plaintiff] sets forth facts from which [the court] could *imagine* an injury sufficient to satisfy Article III's standing requirements."  *Id.*  Instead, "plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements."  *Id.*; *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[A]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element [of standing].").  "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Bochese*, 405 F.3d at 976.

### b) **Injury in Fact**

Injury in fact is "the first and foremost of standing's three elements." *Spokeo*, 136 S. Ct. at 1547.  "When a plaintiff seeks prospective relief to prevent a future injury," as Plaintiff Jarrard does

here, he "must establish that the threatened injury is certainly impending." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020); *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (same); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013) ("[A] threatened injury must be *certainly impending* to constitute injury in fact."). "[A]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409. Nor is a "realistic threat," *Summers v. Earth Island Inst.*, 555 U.S. 488, 499–500 (2009), an "objectively reasonable likelihood" of harm, *Clapper*, 568 U.S. at 410, or "a 'perhaps' or 'maybe' chance" of injury, *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000). The Supreme Court has said that literal certainty is not "uniformly require[d]," and that a "*substantial* risk" or "*substantial* likelihood" of harm may be enough "[i]n some instances." *Clapper*, 568 U.S. at 414 n.5 (emphasis added); *Bowen*, 233 F.3d at 1340 (emphasis added). The required showing is ultimately "a matter of degree," *Thompson v. State Farm Fire & Cas. Co.*, 2016 WL 2930958, at *3 (M.D. Ga. May 19, 2016), and "[h]ow likely is enough is necessarily a qualitative judgment," *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008).

### c)   Analysis

Plaintiff Jarrard seeks a declaration that the Jail's baptism ban is unconstitutional, a "permanent injunction preventing future enforcement" of that ban, and an injunction allowing him to perform baptisms in the Jail going forward.   Because Plaintiff Jarrard seeks "declaratory and injunctive relief," he is necessarily "concerned with future harm, not past harm." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1306 (11th Cir. 2004).[8]   This means he "must establish that the threatened injury is certainly impending" in order to have Article III standing.   *Indep. Party of Fla.*, 967 F.3d at 1280.   The threatened injury here is Plaintiff Jarrard's "inability to perform baptisms for inmates" at the Jail.   (*See* Dkt. 16 ¶ 35; *id.* at 1, 19; *id.* ¶¶ 18, 70–71.)   But, because this injury is not certainly impending, Plaintiff Jarrard lacks standing to obtain the equitable relief he seeks.

At least three things must happen before Plaintiff Jarrard's alleged injury will occur:  (1) an inmate at the Jail must ask to be baptized; (2) the

---

[8] "Declaratory relief is by its nature prospective." *McGee v. Solicitor Gen. of Richmond Cnty.*, 727 F.3d 1322, 1325 (11th Cir. 2013).   So, too, is injunctive relief.   *See Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 734 (11th Cir. 2018) ("Injunctive relief, unlike damages, is inherently prospective in nature.").

inmate must ask Plaintiff Jarrard to perform the baptism; and (3) the Jail must deny the baptism request.  Each of these things depends on "how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.  Indeed, the first two things involve decisionmakers (inmates) who are not even before the Court.  This raises immediate red flags because standing is "substantially more difficult to establish" where it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992); *see Clapper*, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.").  Moreover, any "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.  There is no doubt that the materialization of Plaintiff Jarrard's future injury does depend on a chain of possibilities or a sequence of uncertain assumptions.  That, too, raises red flags.

To make matters worse, the Court cannot say the prerequisites for Plaintiff Jarrard's injury are even *reasonably* likely to happen here.  *See id.* at 410 (standing requires more than "reasonable likelihood" of harm).  They are possibilities at most.  *See id.* at 409 ("[A]llegations of *possible* future injury are not sufficient.").  Plaintiff Jarrard, for example, offers no allegation or evidence anyone in the Jail wants to be baptized at all, much less imminently so.  The complaint says several inmates requested baptism in early 2017 and 2018.  (Dkt. 16 ¶¶ 16, 49–53).  But that was years ago.  It is entirely unclear whether those inmates are still at the Jail—especially since the facility is designed for "short term" incarceration—and, if they are, whether they still want to be baptized.  (*Id.* ¶ 19.)  It is even more speculative to assume that other inmates, who have never shown an interest in baptism (as far as we know), are suddenly interested in it.[9]  Moreover, even assuming inmates are currently seeking baptism, nothing suggests they want Plaintiff Jarrard to administer the ritual.  Indeed, because Plaintiff Jarrard has not set

---

[9] Notably, the Jail's other ministers do not "preach that baptism is required for salvation or seek to have baptisms at the jail." (Dkt. 16 ¶ 33.)

foot in the Jail since he was expelled more than four years ago, it would be surprising if they have their hearts set on him.[10]

Given the totality of the record here, Plaintiff Jarrard has not shown Defendants will imminently stop him from baptizing an inmate unless this Court intervenes. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) ("When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury."). Because

---

[10] The third prerequisite for Plaintiff Jarrard's injury—whether Defendants would deny the baptism request—is a closer call. There is certainly a good argument that they would grant the request *now* because, after Plaintiffs filed this lawsuit, Defendants replaced their blanket baptism ban with a policy allowing inmates to request "rites that are integral [to] their religious faith." (Dkt. 16-5 at 1.) But "Article III standing must be determined as of the time that the plaintiff's complaint is filed." *A&M Gerber Chiropractic*, 925 F.3d at 1212; *see Dunn v. Dunn*, 148 F. Supp. 3d 1329, 1334 (M.D. Ala. 2015) ("Normally, a case begins, for standing purposes, when the initial complaint is filed."). So the new policy is irrelevant to the standing analysis. It might, of course, raise a *mootness* problem. *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1267 (11th Cir. 2001) ("[A] party's standing to sue is generally measured at the time of the complaint, with the effect of subsequent events generally analyzed under mootness principles."). But the Court need not reach that issue because, either way, the Court lacks subject matter jurisdiction under the standing doctrine.

Plaintiff Jarrard has not established a certainly impending injury, he

lacks standing to assert his claim for equitable relief under Count 2.[11]

---

[11] Count 2 also alleges that the 2020 Policy's rule "for admitting religious clergy to the jail" (a) "provides no standards for the exercise of any discretion, thus allowing for arbitrary decisions or decisions based on the religious preferences of jail administrators"; and (b) "contains rules that are vague, overbroad, and amount to viewpoint discrimination, such as 'DON'T TAKE SIDES AGAINST AUTHORITY.'" (Dkt. 16 ¶¶ 72–73.) These allegations are tacked onto the end of Count 2, which is otherwise about the baptism ban, and come entirely out of the blue. They also include no request for relief. If they are meant to be an independent claim, they violate Rule 10's requirement that "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count." Fed. R. Civ. P. 10(b). Nonetheless, because the parties apparently view the allegations as a stand-alone claim, the Court will briefly address them here. To the extent Plaintiff Jarrard challenges the guideline about taking "sides against authority," his challenge fails because the guideline is clearly reasonable—even commonsensical—in the jail context. Plaintiff Jarrard also lacks standing to challenge the guideline at all because he has never even been subject to it—it was apparently issued three years after the Jail expelled him in 2017. Finally, to the extent Plaintiff Jarrard challenges the unbridled discretion entrusted to Jail administrators under the 2020 Policy to determine which "clergymen and religious advisors [may] hold services or conduct programs in the jail," Defendants have not shown—at this stage—that the claim should be dismissed. (*See, e.g.*, Dkt. 25 at 5 (in which Defendants decline to "explain[] why Plaintiffs' various challenges to the policy lack merit").) So that claim may proceed to discovery. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017) ("[T]he plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided. . . . Such a grant of unconstrained power is unconstitutional under the First Amendment."). Though unclear, the Court understands

## V.    Count 3

In Count 3, Plaintiff Jarrard asserts a First Amendment retaliation claim on the ground that Defendants punished him for "sp[eaking] up in support of baptisms at the jail" by expelling him in 2017 and denying his application for readmission in 2020.  (Dkts. 16 ¶ 77; 23 at 2, 11, 14.)   He seeks an injunction "allowing [him] to return to his previous status of ministry, as necessary, to perform the baptisms requested."  (Dkt. 16 ¶ 83.)

Defendants say Count 3 is time-barred to the extent it is based on Plaintiff Jarrard's expulsion from the Jail in January 2017.  The Court agrees.  In Georgia, the statute of limitations for a First Amendment retaliation claim is two years.  *Coates v. Natale*, 2010 WL 749630, at *6 (M.D. Ga. Mar. 1, 2010).  Plaintiff Jarrard filed this lawsuit *three* years after his expulsion from the Jail.  So Count 3's expulsion claim comes one year too late.

The rest of Count 3 is a different story.  It claims Defendants retaliated against Plaintiff Jarrard by denying his 2020 application for

---

this claim to seek "[i]njunctive relief barring enforcement of [the 2020 Policy] as applied to Mr. Jarrard."  (Dkt. 16 at 19.)

jail ministry.  No one disputes this claim is timely.  But Defendants say it fails to state a plausible claim under the First Amendment.  The Court disagrees.

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) [his] speech was constitutionally protected; (2) [he] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech."  *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).  Defendants challenge all three elements here.  They say "Plaintiff's claim fails the first element because ministers have no federally protected right to minister in jails."  (Dkt. 18-2 at 10.)  But "practically all speech enjoys some First Amendment protection."  *Lynch v. Ackley*, 811 F.3d 569, 578 n.8 (2d Cir. 2016); *see Odermatt v. N.Y.C. Dep't of Educ.*, 694 F. App'x 842, 845 (2d Cir. 2017) ("Generally, almost any speech is protected under the First Amendment.").  And Defendants cite no authority for the proposition that a minister's speech is unprotected simply because it occurs in a jail to which he has no independent right of access.

Even if there was authority for that proposition, Plaintiff Jarrard's claim is not premised only on what he said inside the Jail; he repeatedly "spoke up in support of baptisms" *outside* the Jail as well.  For example, he protested "outside the jail regarding [his] inability to perform baptisms for inmates" (Dkts. 16 ¶ 35; 16-4 at 2); he sent Defendant Moats a 2019 letter advocating for jail baptisms (Dkts. 16 ¶¶ 54–55; 16-4); and he filed this 2020 lawsuit challenging the Jail's baptism ban (Dkt. 1). Defendants do not—and could not—claim this speech was unprotected. *See, e.g.*, *Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 155–56 (1973) (Douglas, J., concurring) ("Beliefs, proposals for change, clamor for controls, protests against any governmental regime are protected by the First Amendment against governmental ban or control."); *Kaleta v. City of Anna Maria*, 2017 WL 4417673, at *5 (M.D. Fla. Oct. 3, 2017) ("[L]awsuits are a protected form of petitioning the government for a redress of grievances under the First Amendment."); *Rauen v. City of Miami*, 613 F. Supp. 2d 1324, 1331 (S.D. Fla. 2007) ("It is well-established that peaceful protest is an expressive activity that constitutes protected speech under the First Amendment.").

37

Defendants next say dismissal is required because their "allegedly retaliatory conduct"—denying Plaintiff Jarrard's 2020 application—"would [not] deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). The argument here is that the denial was a "de minimis inconvenience" because (1) Plaintiff Jarrard "has no First Amendment right to minister in the jail" and (2) he "can talk by phone to inmates who want to talk to him." (Dkt. 25 at 8–9.) This argument fails because Defendants did not raise it until their reply brief—and "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994). Moreover, even if Defendants had properly raised the argument, it would fail on the merits. Whether Plaintiff Jarrard had a "right" to enter the Jail is irrelevant here because, to state a plausible retaliation claim, he need only show "he was denied a *benefit*"; "he is not required to show that he had a *right* to the benefit denied." *Nyberg v. Davidson*, 776 F. App'x 578, 582 (11th Cir. 2019) (emphasis added). In other words, "[w]hile there is no constitutional right to [jail ministry], an action, such as [denial of a jail ministry application], that ordinarily would not violate the First

38

Amendment may run afoul of the Constitution if done for a retaliatory purpose." *Id.* at 581.  "The crux of a retaliation claim is that someone suffered an adverse action for having exercised a constitutional right, not that the adverse action deprived someone of such a right." *Id.* at 582; *see Jacoby v. Baldwin Cnty.*, 666 F. App'x 759, 763 (11th Cir. 2016) ("We have never required a plaintiff claiming retaliation to show that the retaliatory conduct, in and of itself, was a violation of his constitutional rights.").

Defendants' assertion that Plaintiff Jarrard can "talk by phone to inmates" fares no better.  Nothing in the record supports this assertion. And, even if it did, the "revocation[] of volunteer minister credentials . . . ha[s] incredible value to the recipient." *Hanson v. Cameron Cnty.*, 2010 WL 148723, at *5 (S.D. Tex. Jan. 14, 2010).  That is so even if the revocation is "valueless" to others and even if the minister can still communicate with inmates outside the jail's volunteer program. *Id.*  Indeed, it is well-settled that the "opportunity to serve as a volunteer constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny." *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992).

Finally, Defendants say dismissal is required because there was no "causal relationship" between Plaintiff Jarrard's baptism advocacy and Defendants' denial of his jail ministry application.   Defendants emphasize that their denial letter said (1) "the Sheriff's Office's decision on the application has no relationship to the existence of pending litigation or any religious doctrinal consideration"; and (2) the denial was "based primarily upon . . . . [Plaintiff Jarrard's] history of being involved in contentious behavior and conflict."   (Dkt. 16-7 at 1–2.)   But the fact that Defendants articulated a legitimate reason—and disclaimed illegitimate reasons—for their decision is not dispositive.   If it were, a government employee would have a free pass to engage in unconstitutional retaliation so long as he or she typed up a fake explanation for the decision.   That cannot be the law.   *See, e.g.*, *Jackson v. Ala. Dep't of Corr.*, 643 F. App'x 889, 893 (11th Cir. 2016) ("[P]laintiff [may] demonstrate that the defendant's proffered reason was merely a pretext to mask retaliatory actions."); *Stephens v. City of Austin*, 2014 WL 3566537, at *6 (W.D. Tex. July 18, 2014) ("[P]retext is a relevant consideration in a First Amendment retaliation case to rebut a

defendant's [assertion] that they would have terminated the employee absent the protected speech.").

"[V]iew[ing] the allegations of the complaint in the light most favorable to the plaintiffs, consider[ing] the allegations of the complaint as true, and accept[ing] all reasonable inferences therefrom," Plaintiff Jarrard has plausibly pled that Defendants' explanation for their decision was pretextual—and that the real reason for their decision was Plaintiff Jarrard's advocacy for inmate baptism. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). According to the complaint, Defendants repeatedly expressed hostility towards Plaintiff Jarrard's beliefs about baptism. (*See, e.g.*, Dkt. 16-4 at 2 (referring to Plaintiff Jarrard's beliefs as "radical").) They repeatedly tried to stop him from expressing those beliefs. They expelled him from the Jail because he converted "too many inmates" to his beliefs. (Dkts. 16 ¶¶ 15, 17; 16-1 at 2.) They falsely attributed that expulsion to his "disruptive behavior toward other members of the jail ministry program." (Dkts. 16 ¶¶ 15, 17; 16-1 at 2; 16-4 at 2.) And they allowed "[o]ther Christian organizations" to engage in jail ministry where those organizations do not "preach that baptism is required for salvation or seek to have baptisms at the jail."

41

(Dkt. 16 ¶ 33; *see id.* ¶ 82 ("Other religious persons, who had a different view on the necessity of baptisms, have been allowed to provide religious services and have been approved to do so.").)   Even Defendants' articulated reason for denying Plaintiff Jarrard's 2020 application—his involvement in "contentious behavior and conflict" at other jails—is ultimately grounded in his support for inmate baptism.   That is so because Plaintiff Jarrard claims this "contentious behavior and conflict" *itself* arose from "discriminatory treatment" to which he was subject because of his views on baptism.  (Dkts. 16 ¶¶ 38–46; 16-6 at 12–15.)

Given the totality of the record here, it is reasonable to infer that Defendants' recent denial of Plaintiff Jarrard's application is merely an extension of what they have been doing all along: (1) punishing him because they do not like his advocacy for inmate baptism; and (2) pretending his "contentious" behavior is the reason for that punishment.  Discovery may, of course, paint a different picture.  And the complaint might even yield competing inferences that are just as credible.  But, based on Plaintiffs' allegations, the above inference is at least plausible.  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) ("[T]he plaintiff is only required to plead a plausible cause of

action; we are not authorized or required to determine whether the plaintiff's plausible inference . . . is equally or more plausible than other competing inferences."). And that is enough to avoid dismissal at the pleading stage, especially since the causation element of a retaliation claim—which is what Defendants challenge here—is "an issue of fact not suitable for disposition upon a motion to dismiss." *USA Entm't Grp., Inc. v. Israel*, 2017 WL 4553441, at *4 (S.D. Fla. Oct. 12, 2017); *see Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1375 (S.D. Ga. 2015) ("A determination as to whether a defendant would have taken the same action in the absence of the protected activity is premature when the parties have not conducted discovery."). Count 3 is allowed to proceed to the extent it asserts a retaliation claim based on Defendants' denial of Plaintiff Jarrard's 2020 application for jail ministry.[12]

––––––––––––––––

[12] To the extent Plaintiff Jarrard asserts Count 3 against Defendants in their official capacities, Defendants argue—in their reply brief only—that sovereign immunity bars the claim. (Dkt. 25 at 2.) Under the *Ex parte Young* doctrine, sovereign immunity "does not generally prohibit [claims] seeking only prospective injunctive or declaratory relief," as Count 3 does here. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999). But Defendants say (1) "the *Ex parte Young* doctrine cannot be used to compel an executive official to undertake a discretionary task" and (2) Count 3 violates that principle because it requests "admission to jail ministry," which "involves a

## VI.   Conclusion

Defendants' Pre-Answer Motion to Dismiss (Dkt. 18) is **GRANTED IN PART** and **DENID IN PART**.   Count 1 is **DISMISSED** for lack of subject matter jurisdiction.   Count 2 is **ALLOWED TO PROCEED** to the extent (a) Plaintiff Morris challenges Defendants' baptism ban and (b) Plaintiff Jarrard challenges the discretion entrusted to Jail administrators under the 2020 Policy to determine which "clergymen and religious advisors [may] hold services or conduct programs in the jail." Count 2 is otherwise **DISMISSED** for the reasons explained earlier in this Order.   Count 3 is **ALLOWED TO PROCEED** to the extent it asserts a retaliation claim based on Defendants' denial of Plaintiff

---

discretionary decision by the Sheriff's Office."   (Dkt. 25 at 2.)   The argument is an interesting one.   But the Court declines to consider it because Plaintiff Jarrard makes only a "passing reference to [the] issue in [his reply] brief," which "is not enough" to raise it for judicial review. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012); *see Coy*, 19 F.3d at 632 n.7.   And "courts are not required to raise sovereign immunity *sua sponte.*"   *Stern v. Leath*, 2019 WL 1573695, at *1 (M.D. Ala. Apr. 11, 2019); *see Keeler v. Fla. Dep't of Health, Div. of Disability Determinations*, 397 F. App'x 579, 581 (11th Cir. 2010) ("[T]he Eleventh Amendment is not jurisdictional in the sense that courts must address the issue *sua sponte.*").

Jarrard's 2020 application for jail ministry.  It is otherwise **DISMISSED** as time-barred.

      **SO ORDERED** this 30th day of March, 2021.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE