# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

Reverend Stephen Jarrard and
Ollie Mitchell Morris,

                 Plaintiffs,

                       Case No. 4:20-cv-2-MLB

v.

Sheriff Johnny Moats, Chief
Deputy Al Sharp, and Deputy
Dustin Strop,[1]

                 Defendants.

_____/

## OPINION & ORDER

Plaintiff Jarrard is a Christian evangelist. He previously worked as a volunteer minister at Polk County Jail. In that role, he repeatedly taught inmates that baptism by immersion is necessary for salvation. He left the jail in 2017 but, a few years later, reapplied for the same position. This time, Defendants Moats and Sharp (sheriff and chief jailer) denied

---

[1] Defendant Strop's last name may actually be "Stroup." (*See, e.g.*, Dkt. 63 at 5.) But the case caption in the complaint says otherwise. So the Court follows suit.

his application.  Plaintiff claims they did so "solely due to his teaching on baptism."  (Dkt. 70 ¶ 54.)

Plaintiff Morris is a former inmate at the jail.  During his incarceration, he asked to be baptized by immersion.  But the jail had a written policy banning inmate baptism.  So all three Defendants (including Defendant Strop, a jailer) denied Plaintiff's request.

Plaintiffs filed this three-count lawsuit as a result.  Count 1 claims Defendants banned inmate baptism—and denied Plaintiff Morris's own request for baptism—in violation of the First Amendment.  Count 2 asserts a First Amendment retaliation claim on the theory that Defendants denied Plaintiff Jarrard's minister application because they did not like his "teaching on baptism."  Count 3 claims the jail's written policies violated the First Amendment because they gave Defendants "unbridled discretion" over who to appoint as volunteer ministers at the jail.  Plaintiffs assert these claims against Defendants solely in their individual capacities.  And Plaintiffs only seek damages.[2]

---

[2] Plaintiffs have largely abandoned their equitable and official-capacity claims by explicitly withdrawing them or by not asserting/defending them on summary judgment.  To the extent any such claims remain, they are moot or meritless.  (*See* Dkts. 34 at 14 n.6; 57-3 at 5 & n.3, 24–25; 58-2 at 16–17; 68 at 2; 69 at 16; 70-2 at 1; 73 at 1–2.)

Defendants now move for summary judgment on all three counts. (Dkts. 57; 58.)  Plaintiff Jarrard also moves for summary judgment on Count 3.  (Dkt. 56.)  The Court grants summary judgment to Defendants on Counts 2–3 and denies summary judgment on Count 1.

## I.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## II.    Count 1

Count 1 claims Defendants refused to let Plaintiff Morris get baptized by immersion while he was an inmate at Polk County Jail, in violation of his free exercise rights under the First Amendment. Defendants say qualified immunity bars this claim.  The Court finds qualified immunity protects Defendant Strop but not Defendants Sharp and Moats.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Gates*

*v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018). An official asserting this defense must show that he "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The burden then "shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.* This requires plaintiff to show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*

Plaintiff Morris does not—and could not—dispute that Defendants acted within their discretionary authority when they banned inmate baptism and denied Plaintiff's own request for baptism. *See Davila v. Marshall*, 649 F. App'x 977, 982 (11th Cir. 2016) (jail officials "act[ed] within their discretionary authority when they made decisions about [an inmate's] access to his religious items"). So, to avoid qualified immunity, Plaintiff must show Defendants violated clearly established law under the Free Exercise Clause of the First Amendment.[3] That provision

---

[3] In addressing Count 1, the Court's use of the term "Plaintiff" refers to Plaintiff Morris. In addressing Counts 2 and 3, its use of the term refers to Plaintiff Jarrard.

"prohibits prison officials from imposing a substantial burden on the free exercise of an inmate's sincerely held religious belief unless their actions or restrictions are reasonably related to legitimate penological interests." *Sajous v. Withers*, 2018 WL 10151942, at *6 (S.D. Fla. Jan. 16, 2018); *see Robbins v. Robertson*, 782 F. App'x 794, 801 (11th Cir. 2019); *Prison Legal News v. McDonough*, 200 F. App'x 873, 877 (11th Cir. 2006). The Court considers whether Defendants violated this rule and, if so, whether the violation was egregious enough to preclude qualified immunity.

## A.     Defendants Sharp and Moats

### 1.     Sincerely Held Religious Belief

To prove a free exercise claim under the First Amendment, Plaintiff must first identify a "sincerely held religious belief." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1247 (11th Cir. 2019). Plaintiff has done that here. He testified that, when he was incarcerated at Polk County Jail, he believed baptism by immersion was necessary for salvation. He said he "want[s] to be saved" and, to do that, he must "believe[] and [be] baptized." (Dkt. 66 at 43–45.) He said baptism is "about eternal salvation." (*Id.* at 86.) He said he got baptized as soon as he left the jail and, when he did so, he "drastically

changed," became "a child of God" and had his name "written in the Lamb's Book of Life." (*Id.* at 87, 89.) He said he disagrees with "preachers who took the view on baptism that it was not necessary for salvation." (*Id.* at 65.) He said "[b]aptism is a submersion," not a "sprinkling." (*Id.* at 53–54, 69.) And he said non-immersion baptism is a "trick" grounded in "twisted descriptions [of] what God said." (*Id.* at 53–54, 69.)

When pressed, Plaintiff did say he was unsure whether he would have gone to Hell had he "suddenly . . . dropped dead without being baptized" while incarcerated at Polk County Jail. (*Id.* at 44–45.) But, as he explained, that uncertainty was not because baptism was optional but because he was "trying" to get baptized and Defendants "wouldn't let [him]." (*Id.* at 45.) Under those unique circumstances, he simply noted "God's the judge," he could not say for sure what God would do, and all he could go on was "what the Bible says," which was "believe[] and [be] baptized." (*Id.* at 44–45.) Given the totality of Plaintiff's testimony, a jury could easily find that, when he asked to be baptized in Polk County Jail, he believed baptism by immersion was necessary for salvation. That counts as a sincerely held religious belief. *See Cambridge Christian Sch.,*

942 F.3d at 1247 ("What constitutes a 'sincerely held belief' is not a probing inquiry.").

## 2. Substantial Burden

The Court next considers whether Defendants "impose[d] a substantial burden on the ability of [Plaintiff] to conduct himself in accordance with his religious beliefs." *Davila v. Gladden*, 777 F.3d 1198, 1205 (11th Cir. 2015). "[T]o constitute a substantial burden, the governmental action must significantly hamper one's religious practice." *Id.* This does not require an "insuperable" burden. *Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama*, 980 F.3d 821, 830 (11th Cir. 2020). But it does require something more than "inconvenience" or "an incidental effect on religious exercise." *Hoever v. Belleis*, 703 F. App'x 908, 912 (11th Cir. 2017); *Davila*, 777 F.3d at 1205. The burden must be "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior." *Thai Meditation*, 980 F.3d at 830.[4]

---

[4] Some of this language is "derived from precedents interpreting the Religious Land Use and Institutionalized Persons Act and the Religious Freedom Restoration Act." *Hoever*, 703 F. App'x at 912. The Eleventh Circuit has repeatedly "applied similar definitions of 'substantial burden' when assessing claims under [those statutes] and the Free Exercise Clause." *Robbins v. Robertson*, 782 F. App'x 794, 802 n.5 (11th Cir. 2019).

A jury could easily conclude that standard is met here. Defendants Sharp and Moats enacted a written policy outright *banning* baptism at the jail. (Dkts. 62 at 25; 70 ¶ 10.) And Plaintiff testified that each Defendant denied his own request for baptism. (Dkts. 66 at 11–12; 73-1 ¶¶ 11–13.) This "completely prevent[ed] [Plaintiff] from engaging in religiously mandated activity." *Hoever*, 703 F. App'x at 912. And, as the Court held at the pleading stage, that counts as a substantial burden. (Dkt. 34 at 18.)[5]

Defendants counter that Plaintiff was baptized when he was ten years old and, to the extent he wanted to be baptized again, he could

_____

Other circuits have done the same thing. *See, e.g.*, *Khan v. Barela*, 808 F. App'x 602, 615 n.12 (10th Cir. 2020); *Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019); *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003).

[5] Reading Plaintiff's deposition testimony as a whole, it is not entirely clear that Defendant Moats did deny Plaintiff's request for baptism. But the parties' Local Rule 56.1 filings suggest this is a disputed fact. (Dkt. 70 ¶ 15 (citing Plaintiff's testimony that he "reached out to Johnny Moats and Johnny Moats said no").) And no one meaningfully argues otherwise. So the Court leaves it to a jury to unravel. Moreover, even if Defendant Moats did not personally deny Plaintiff's baptism request, a jury could find him responsible on a theory of supervisory liability. *See Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) ("Supervisory liability under § 1983 occurs when . . . . a supervisor's custom or policy results in deliberate indifference to constitutional rights" or when "the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so").

simply wait until he got out of jail because "baptism [need not] be accomplished in any particular time frame." (Dkt. 58-2 at 8–10.) But Plaintiff testified his childhood baptism "wasn't valid" because it involved sprinkling rather than immersion and his "heart wasn't ready." (Dkt. 66 at 53–55.) He said he "didn't know Jesus," he "didn't know nothing about the Bible," and he only went ahead with it "for [his] grandmother." (*Id.*) So, on Plaintiff's view, his prior baptism did not preclude the theological need for another one. (*See id.* at 54.) That belief controls. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 95 (11th Cir. 2007) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. . . . The test is sincerity.").

Defendants' baptism-can-wait argument also fails because, again, it is based on Defendants' own reading of the Bible rather than Plaintiff's beliefs. (*See* Dkt. 58-2 at 9 ("[H]ard to discern from the Bible's text is any requirement that baptism be accomplished in any particular time frame.").) And even assuming Plaintiff did believe "baptism [need not] be accomplished in any particular time frame," that would not be dispositive. An inmate's free exercise rights are not limited to

"now-or-never" religious practices. Plaintiff was incarcerated for a considerable period (almost three years) and the religious practice he wanted to pursue was integral to his faith. Requiring him to hold off on a soul-saving practice for several years imposed a "substantial burden" on his religious exercise under any definition of that phrase. *See Davila*, 777 F.3d at 1205 ("[A] burden is substantial when it prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief").

### 3.    Defendants' Justification

The final consideration is whether Defendants Sharp's and Moats's actions—in banning inmate baptism and denying Plaintiff's own request for baptism—were "reasonably related to legitimate penological interests." *Pesci v. Budz*, 935 F.3d 1159, 1165 (11th Cir. 2019). This is known as the *Turner* test. *See Turner v. Safley*, 482 U.S. 78 (1987). To prove a free exercise violation, Plaintiff must show Defendants' actions were *not* reasonably related to any legitimate penological interests. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Plaintiff has made that showing.

There is substantial evidence that Defendants Sharp and Moats banned inmate baptism and denied Plaintiff's baptism request because they personally believe baptism is not necessary for salvation. Both Defendants testified they hold that theological view. (Dkts. 61 at 30; 73-1 ¶ 25.) Plaintiff testified that, after he asked to be baptized, Defendant Sharp told him and a group of other inmates that "as baptism was not required for their salvation, the facility would not provide that service." (Dkt. 66 at 20–25.) And, on the day of Plaintiff's release, Defendant Moats told Plaintiffs' attorney *in writing* (while under the specter of litigation) that he banned inmate baptism based on his own religious views:

> The Bible sets forth what a person must do to receive salvation, not any church denomination nor the court. "If you declare with your mouth, Jesus is Lord, and believe in your heart that God raised him from the dead, you will be saved" (Romans 10:9). Baptism is not mentioned here as a requirement to salvation. "He who believes and is baptized will be saved; but he who does not believe will be condemned" (Mark 16:16). In the case of baptism and salvation, the Bible is clear that salvation is by grace through faith in Jesus Christ, not by works of any kind, including baptism (Ephesians 2:8-9). Our stance is since the Polk County Jail is a short term detention center, baptism can wait until after release since it is not a requirement for salvation.

(Dkt. 53-3 at 1–2.)  To the extent Defendants Sharp and Moats prevented Plaintiff from getting baptized simply because they believe baptism is theologically unnecessary, their conduct is unrelated to legitimate penological interests and violates the First Amendment.

Defendants Moats and Sharp do not claim their religious views constitute a legitimate government interest (which would be an absurd argument).  Instead, they cite other reasons for banning baptism, specifically "jail security and the prevention of slips and falls."  (Dkt. 58-2 at 10.)  But a jury could easily find those reasons are pretextual. Defendant Moats's written explanation to Plaintiffs' attorney—which is the only contemporaneous evidence we have—focuses on theology, not safety or security.  Defendants' after-the-fact testimony about safety and security is mostly vague or conclusory.  And there are several reasons to question whether inmate baptism really poses the risks Defendants cite. For example, Defendant Sharp testified inmate baptisms would take no more than 5–10 minutes.  (Dkt. 62 at 17.)  Plaintiff Jarrard testified he previously baptized inmates at the jail without issue.  (Dkt. 60 at 52; *see* Dkt. 61 at 56–57.)  Sheriff's Office records reveal only *one* slip-and-fall incident at the jail (dated October 2021), which flatly contradicts

Defendants' testimony that the jail sees "lot[s] of slip-and-fall claims." (Dkts. 61 at 71; 62 at 17–18; 70-4; 70-5.) Inmates routinely navigate wet surfaces in the jail, including when they shower or wash police cars. (Dkts. 62 at 18; 70-6.) And other jails and prisons across the country, including some in Georgia, allow inmates to get baptized by immersion without any apparent issues. (Dkt. 72-1 ¶ 43.) Given the totality of this evidence, a jury could find Defendants were motivated by illegitimate interests (theology) rather than the legitimate interests (safety and security) on which they now rely. *See Holley v. Seminole Cnty. Sch. Dist.*, 755 F.2d 1492, 1505 (11th Cir. 1985) ("[I]ssues of motivation are generally improper for disposition on summary judgment."). That is fatal under *Turner*.[6]

---

[6] Defendants do not argue litigation-based pretextual justifications can save conduct that would otherwise be unconstitutional under *Turner*. And the weight of authority does not support that view. *See Haze v. Harrison*, 961 F.3d 654, 659 n.3 (4th Cir. 2020) (rejecting alleged safety interest because "the record does not reflect that this was the actual reason" for defendants' conduct); *Salahuddin v. Goord*, 467 F.3d 263, 276–77 (2d Cir. 2006) ("Under both *Turner* and *O'Lone*, . . . prison officials must show that the disputed official conduct was motivated by a legitimate penological interest. Post hoc justifications with no record support will not suffice."); *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993) ("Prison officials are not entitled to the deference described in *Turner* . . . if their actions are not actually motivated by legitimate penological

### 4.  Cleary Established Law

Plaintiff has presented enough evidence to show a constitutional violation, namely, that Defendants Sharp and Moats banned inmate baptism and denied his baptism request in violation of the Free Exercise Clause.  But, to get past summary judgment, Plaintiff must also show these Defendants violated clearly established law.  To be clearly established, the law must be "so clear that, given the specific facts facing a particular officer, one must say that every reasonable official would have understood that what he is doing violates the Constitutional right at issue." *Gates*, 884 F.3d at 1302.  "The critical inquiry is whether the law provided [officials] with fair warning that their conduct violated the [Constitution]." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

---

interests at the time they act.").  Neither the Supreme Court nor the Eleventh Circuit has squarely decided the issue.  But there is good reason to believe they would follow the majority view. *See Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (*Turner* requires courts to assess "the governmental *objective*" and "[t]he legitimacy of the Government's *purpose*" (emphasis added)); *Turner*, 482 U.S. at 98 (rejecting alleged security concerns because the government "pointed to nothing in the record suggesting that the [challenged] regulation was viewed as preventing such [concerns]"); *Pesci*, 935 F.3d at 1169–70 (noting, in the *Turner* context, that "a reviewing court must always be careful to make certain that prison administrators are not pretextually using alleged concerns in order to punish an inmate for his or her political or other views").

"Fair warning is most commonly provided by materially similar precedent." *Gates*, 884 F.3d at 1296. But "[a]uthoritative judicial decisions may [also] establish broad principles of law that are clearly applicable to the conduct at issue." *Id.* Or "it may be obvious from explicit statutory or constitutional statements that conduct is unconstitutional." *Id.* at 1296–97. "In all of these circumstances, qualified immunity will be denied only if the preexisting law by case law or otherwise makes it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Id.* at 1297. "[T]he unlawfulness of the conduct must be apparent from pre-existing law." *Coffin*, 642 F.3d at 1013.

Plaintiff has shown a violation of clearly established law under these standards. Although he cites no materially similar precedent, this is one of those rare cases where Defendants' conduct violated the First Amendment "as a matter of obvious clarity." *Coffin*, 642 F.3d at 1014. No reasonable officer could think it is lawful to ban inmate baptism, including for those who believe baptism is essential for salvation, simply because the officer personally holds a different religious view. Such a ban would obviously fail the *Turner* and "substantial burden" tests—both

of which are clearly established in the caselaw—and would violate the Free Exercise Clause on its face. Defendants Sharp and Moats had no reason to doubt—and several reasons to credit—the sincerity and religiousness of Plaintiff's belief in baptism. (*See, e.g.*, Dkts. 61 at 32; 66 at 29; 66-3 at 1.) They knew that, by banning baptism and denying Plaintiff's request to be baptized, they were "completely prevent[ing]" Plaintiff and others from "engaging in religiously mandated activity." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004). And they went ahead anyway based solely on their own religious view that baptism is unnecessary. That was an obvious First Amendment violation. No reasonable officer could conclude otherwise. So qualified immunity does not apply to these two Defendants.

## B.     Defendant Strop

Defendant Strop is a different story. Unlike the others, Defendant Strop was not involved in developing the jail's baptism ban. Nothing suggests he holds any religious views about baptism. (Dkt. 63 at 10 (testifying he is "agnostic" about religion).) He knows nothing about Defendant Moats's religious views. (Dkt. 63 at 11.) He never "personally looked at the role of baptisms in a particular faith." (*Id.* at 10.) And there

is no evidence he believed—or should have believed—the jail's baptism ban was based on theology. He did deny Plaintiff's baptism request but, in doing so, he simply applied the jail's written policy and "communicat[ed] . . . decisions made by Mr. Sharp." (*Id.* at 11, 19–21.) Plaintiff has not shown Defendant Strop's actions were obviously unrelated to "legitimate penological interests" or otherwise unconstitutional under *Turner*. So Defendant Strop is entitled to qualified immunity. *See Cavin v. Heyns*, 2017 WL 11621988, at *4 (6th Cir. Sept. 12, 2017) ("[Plaintiff] failed to overcome the defendants' claim of qualified immunity because he did not show that a balancing of the *Turner* factors clearly established that the prison officials were violating his constitutional right."); *Barnes v. Furman*, 629 F. App'x 52, 57 (2d Cir. 2015) ("When officials follow an established prison policy," they are entitled to qualified immunity if "a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting the directive").

## C.    Conclusion

Defendant Strop is entitled to summary judgment on Count 1. Defendants Sharp and Moats are not, because a jury could conclude they violated clearly established law under the First Amendment.[7]

## III.   Count 2

Plaintiff Jarrard asserts a First Amendment retaliation theory in Count 2.  He claims Defendants denied his application to be a volunteer minister because, when he previously volunteered at the jail, he taught inmates that baptism by immersion is necessary for salvation. Defendants invoke qualified immunity as a defense to this claim. Plaintiff does not dispute that Defendants acted within their discretionary authority, so, to defeat qualified immunity, he must show Defendants violated clearly established law.  He has not done that.[8]

---

[7] Defendants briefly argue that the Prison Litigation Reform Act "bars all but nominal and punitive damages."  (Dkt. 72 at 7.)  This argument goes to damages rather than liability.  And Defendants give it short shrift in their papers.  (Dkts. 58-2 at 16; 72 at 7.)  So the Court declines to address it at this stage.

[8] Count 2 also claims Defendants "fail[ed] to respond" to Plaintiff's most recent minister application in violation of the First Amendment.  (Dkt. 53 ¶ 80.)  But the Sheriff's Office closed its jail ministry program during the COVID-19 pandemic and only reopened the program earlier this year (at which point it did respond to Plaintiff's application).  (Dkts. 56-3; 70

## A.  Legal Framework

As an initial matter, the parties dispute whether Count 2 is governed by the legal framework established in *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968) and its progeny (together, "*Pickering*").[9]  So the Court begins with that threshold issue.

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) [his] speech was constitutionally protected; (2) [he] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). *Pickering* fleshes out the meaning of the first element—constitutionally protected speech—where the speaker is a government employee.  It says, "for a government employee's speech to have First Amendment protection, the employee must have (1) spoken as a citizen and

---

¶ 62; 70-9.)  That explains the delayed response. (Dkt. 70 ¶ 63.)  And, even if a jury could read in a more sinister explanation, Plaintiff's "delayed-response" claim would still fail for the same reasons as his "denied-application" claim.

[9] *Pickering's* progeny includes—among other cases—*Connick v. Myers*, 461 U.S. 138 (1983) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

(2) addressed matters of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1341–42 (11th Cir. 2007). This makes public employee speech less protected than private citizen speech. *See White v. Sch. Bd. Hillsborough Cnty., Fla.*, 2009 WL 174944, at *2 (11th Cir. Jan. 27, 2009); *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 976–77 (7th Cir. 2000) ("[G]overnment [may] regulate the speech of its employees in a manner that, outside the employer-employee relationship, would violate the First Amendment."). But that is warranted because "the state as employer has a special interest in regulating its employees' behavior in order to avoid the disruption of public functions." *McCabe v. Sharrett*, 12 F.3d 1558, 1568 (11th Cir. 1994).

Plaintiff argues *Pickering* does not apply here because he was "a volunteer rather than a paid employee." (Dkt. 70-2 at 7.) But "courts have extended the application of the *Pickering* analysis to cover more than just traditional public employees." *McKinley v. Kaplan*, 262 F.3d 1146, 1150 n.5 (11th Cir. 2001). The Supreme Court has extended it to government contractors. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 673 (1996). The Eleventh Circuit has extended it to unpaid government appointees and other public sector

volunteers.  *See Rodin v. City of Coral Springs, Fla.*, 229 F. App'x 849, 852, 855 (11th Cir. 2007) (applying *Pickering* to "a volunteer firefighter, not a paid city employee"); *McKinley*, 262 F.3d at 1150 n.5 (applying *Pickering* to "an unpaid political appointee to a public advisory board" despite expressing reservations).  And at least two courts have extended it specifically to volunteer government chaplains.  *Mustapha v. Monken*, 2013 WL 3224440, at *6 (N.D. Ill. June 25, 2013); *Mayfield v. City of Oakland*, 2007 WL 2261555, at *4 (N.D. Cal. Aug. 6, 2007).  So Plaintiff's status as a county volunteer does not exempt him from *Pickering*.

Plaintiff next argues that, even if some government volunteers can trigger *Pickering*, his volunteer position (jail minister) does not do so because it is not sufficiently "employment-like."  (Dkt. 71 at 10 n.2.)  He cites no evidence or authority for this proposition.  And it is not entirely clear what he means.  But, even assuming some threshold level of "employment-likeness" were required, the record suggests that threshold is present here.  The Sheriff's Office application form refers to jail ministry as "volunteer work."  (Dkt. 60-1 at 1, 3; *see also* Dkt. 70 ¶ 43 (Plaintiff accepting this characterization).)  It notes applicants can be "terminat[ed]" once "hired."  (Dkt. 60-1 at 5.)  It requires applicants to

sign the same confidentiality agreement as employees. (*Id.* at 19.) And it requires applicants to sign other employment-like forms, including a waiver of liability and a criminal history check. (*Id.* at 18, 20.) The Sheriff's Office also "hired" a *lead* jail minister, gave him "staff," put him in charge of volunteer ministers, and gave him authority to terminate those ministers. (Dkts. 60 at 87, 155; 61 at 28; 62 at 19.) All of this sounds "employment-like." That other courts have applied *Pickering* to volunteer ministers further suggests there is no impediment to doing so here. *See Mustapha*, 2013 WL 3224440, at *6; *Mayfield*, 2007 WL 2261555, at *4.

Finally, Plaintiff claims that, even if *Pickering* applies to volunteer jail ministers, it does not apply to him because he was not actually a jail minister when Defendants retaliated against him—he was merely an *applicant* who was trying to become one. (Dkt. 71 at 10 n.2; *see* Dkt. 70-2 at 8–9.) But "[t]he *Pickering* line of cases protects against . . . . [a] refusal to hire." *Goffer v. Marbury*, 956 F.2d 1045, 1049 n.1 (11th Cir. 1992); *see Worrell v. Henry*, 219 F.3d 1197, 1207 (10th Cir. 2000) ("This circuit has applied the *Pickering* balancing to hiring decisions. Other

circuits have taken the same approach.").[10]  So *Pickering* applies to job

applicants like Plaintiff.  Moreover, Plaintiff's theory is that Defendants

refused to hire him in retaliation for what he previously told inmates

*when he worked at the jail.*  There is no real distinction between

terminating an employee for his or her speech on the job (which is the

paradigmatic *Pickering* scenario) and refusing to hire an employee for his

or her speech on the job (which is what we have here).  Plaintiff does not

explain why *Pickering* applies to the former but not the latter.  Nor could

he.  Both scenarios implicate the same rationale underlying *Pickering*:

"the state as employer has a special interest in regulating its employees'

---

[10] *See also De La Garza v. Brumby*, 2013 WL 754260, at *4 n.4 (S.D. Tex. Feb. 27, 2013) ("[C]ourts have consistently applied [*Pickering*] to hiring cases, and . . . *Pickering* actually has its origins in refusal-to-hire cases."); *Joyce v. Block*, 2000 WL 34236016, at *3 (W.D. Wis. Aug. 9, 2000) ("[T]he *Connick-Pickering* test is used to determine whether the employer has the right to refuse to hire a prospective employee despite the protected speech.").  Courts have also applied *Pickering* where the government refused to engage a third-party contractor.  *See, e.g.*, *Heritage Constructors, Inc. v. City of Greenwood, Ark.*, 545 F.3d 599, 601 (8th Cir. 2008) (applying *Pickering* to a contractor whose "previous relationship with the city ended four years before [the alleged retaliation]"); *Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.*, 463 F.3d 378, 380, 382–83 (5th Cir. 2006) (applying *Pickering* to "a contractor whose bid has been rejected by a city in retaliation for the contractor's exercise of freedom of speech where the contractor had no pre-existing relationship with that city").

behavior in order to avoid the disruption of public functions." *McCabe*, 12 F.3d at 1568; *see Hubbard v. EPA*, 949 F.2d 453, 460 (D.C. Cir. 1992) (applying *Pickering* to a hiring decision and observing that different rules were not required "[m]erely because an employer is *hiring* rather than *firing*").

Plaintiff has not shown *Pickering* is inapplicable or that another framework should control. So the Court evaluates Count 2 under *Pickering*.

## B. Citizen Speech

To establish a First Amendment claim under *Pickering*, a public employee must first show that the speech for which he claims he suffered retaliation was made "in his capacity as a [private] citizen." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015); *see Williams v. City of Atlanta*, 618 F. App'x 957, 959 (11th Cir. 2015) ("As a threshold matter, the employee must also show that he spoke in his capacity as a citizen."). "If instead of speaking as a citizen he spoke as an employee in furtherance of his ordinary job duties, his speech was not protected by the First Amendment and his claim fails." *Olbek v. City of Wildwood, FL*, 850 F. App'x 714, 719 (11th Cir. 2021).

"Whether the plaintiff spoke as an employee is a practical inquiry and a few of the non-dispositive factors that [courts] consider are [the employee's] job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Id.* Ultimately, speech is not protected if it "owes its existence to the employee's professional responsibilities" or was "made in accordance with or in furtherance of [those] responsibilities." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1161–62 (11th Cir. 2015); *see id.* at 1161 ("[T]he controlling factor is whether the employee's statements or expressions were made pursuant to [his] official duties."). In applying this test, courts define an employee's responsibilities broadly rather than narrowly. This makes it more likely that an employee's statements will fall within those responsibilities and count as employee speech. *See Abdur-Rahman v. Walker*, 567 F.3d 1278, 1284 (11th Cir. 2009) ("We have consistently discredited narrow, rigid descriptions of official duties urged upon us to support an inference that public employees spoke as private citizens."); *see, e.g.*, *Fernandez v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 898 F.3d 1324, 1334 (11th Cir. 2018) (defining employees' duties to include "broad administrative responsibilities" and

"fulfilling their roles as coordinators, psychologists, committee members, and supervisors").

Plaintiff's theory is that Defendants retaliated against him for teaching Polk County Jail inmates that baptism by immersion is necessary for salvation. (Dkt. 70 ¶ 54.) So, to succeed on his claim, Plaintiff must show he taught that theology as a private citizen rather than a volunteer jail minister. He has not made that showing. As a jail minister, Plaintiff was responsible for "preach[ing] and talk[ing] to the inmates about religion." (Dkt. 61 at 24). That is exactly what he did when he taught inmates about his religious views on baptism. His lessons "occurred at [Plaintiff's] workplace"—the jail where he volunteered. *Olbek*, 850 F. App'x at 719. And it is undisputed that Plaintiff conveyed his message "in the course of performing [his] job." *Alves*, 804 F.3d at 1164. Plaintiff's speech "cannot reasonably be divorced from [his ministry] responsibilities." *Id.* So his statements count as employee speech and are not protected by the First Amendment. *Id.*

Plaintiff claims religious speech can *never* be government employee speech under the First Amendment. (Dkt. 70-2 at 10.) But he cites no authority for that proposition. And it makes no sense. The government

employs several chaplains. *See Benning v. Georgia*, 391 F.3d 1299, 1310 (11th Cir. 2004) ("State and federal funds provide government chaplains for Congress and state legislatures, the armed forces, and prisons."). That is allowed. *See Murphy v. Derwinski*, 990 F.2d 540, 547 (10th Cir. 1993) ("Government chaplaincy programs have been upheld in the face of Establishment Clause challenges."). A government chaplain's job, like any job, involves official duties. So, when a chaplain discusses religion "pursuant to [those] duties," he engages in employee speech under binding First Amendment law. *Garcetti*, 547 U.S. at 421. To the extent Plaintiff believes chaplains should be excluded from this rule as a matter of policy, that is an argument for Congress, not the Court.[11]

Plaintiff also argues his "relevant speech is broader than simply ministering to inmates." (Dkt. 70-2 at 10.) He says it includes "advocacy," a "protest outside the jail," "letters to the Sheriff," and "filing . . . this lawsuit." (*Id.* at 8, 10–11.) But, in his Rule 56.1 filings, Plaintiff admits he was retaliated against "solely due to his teaching on baptism

---

[11] Plaintiff's policy argument is dubious anyway. He thinks the government should not be able to regulate "religious instruction." (Dkt. 70-2 at 10.) But, once you accept the government can hire people to deliver religious instruction, it is hard to say the government cannot exercise *any* control over that instruction.

and not for any other expression such as his protest in front of the jail." (Dkt. 70 ¶ 54.)  That admission controls.  *See* LR 56.1, NDGa.  Besides, Defendants expelled Plaintiff from the jail in 2017 before most of his non-ministry speech occurred.   And, read in Plaintiff's favor, the record suggests they did so specifically because he taught inmates about his view on baptism.  (*See, e.g.*, Dkts. 60 at 37–43; 60-8; 73-1 ¶ 63.)  When Defendants denied Plaintiff's minister application a few years later—which is the retaliatory action alleged in this case—nothing suggests their rationale for keeping him out of the jail had changed.  (Dkt. 70 ¶ 54.)[12]   Plaintiff himself testified that the reason for which he was "originally terminated"—his "teaching on baptism"—has been "at the heart of [this case] from the beginning" and was the sole reason Defendants denied his application.  (Dkts. 60 at 124; 70 ¶ 54.)  Plaintiff presented that "teaching" as a jail minister rather than a private citizen. So the speech is not protected, and his retaliation claim fails.  *See Boyce*, 510 F.3d at 1343 ("If the government employee . . . was speaking as an

---

[12] Or, to put it more accurately, nothing suggests Defendants' rationale had changed *in a way that supports Plaintiff's claim*.   To the extent Defendants were motivated by new rationales at all, the record suggests those rationales were legitimate, not retaliatory.  (*See* Dkt. 70 ¶¶ 45–53.)

employee, then there can be no First Amendment issue, and the constitutional inquiry ends.").

## C.  Public Concern

Even if Plaintiff had spoken as a private citizen, his retaliation claim would still fail because his speech addressed "matters of only personal interest" rather than "a matter of public concern." *Alves*, 804 F.3d at 1162.  "The meaning of the term 'public concern' is not without ambiguity," and courts have not always been clear or consistent in how they approach the concept. *Kurtz v. Vickrey*, 855 F.2d 723, 726 (11th Cir. 1988).  But a few principles are well-established.  "Speech is considered to deal with a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *United States v. Fleury*, 20 F.4th 1353, 1364 (11th Cir. 2021).  "This determination depends on the content, form, and context of the speech as revealed by the whole record." *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1214 (11th Cir. 2014).  "But the most important factor is the content of the speech." *Gomez v. City of Doral*, 2022 WL 19201, at *6 (11th Cir. Jan.

3, 2022). "A court may also consider the employee's attempt to make [his] concerns public along with the employee's motivation in speaking." *Alves*, 804 F.3d at 1162.

Plaintiff has not met his burden on the public-concern element because his argument is only one sentence long and includes no citations to evidence or authority.[13] "For an issue to be adequately raised in [a] brief, it must be . . . supported by arguments and citations to the record and to relevant authority." *Whitten v. Soc. Sec. Admin., Comm'r*, 778 F. App'x 791, 793 (11th Cir. 2019). Where a party does not "support [his] arguments with sufficient detail"—including with "citations to authority or significant discussion"—courts "consider these arguments abandoned and do not consider them." *Nat'l Mining Ass'n v. United Steel Workers*,

---

[13] Plaintiff's one-sentence argument reads: "Religious instruction for incarcerated individuals is generally a matter of public concern because of its importance for connecting inmates to the community upon their release, for tending to their spiritual well-being while detained, and for furthering their salvation in the afterlife." (Dkt. 70-2 at 10–11.) Plaintiff does make a separate attempt to show his *non-ministry* speech addressed matters of public concern. (*Id.* at 11.) But the Court has already concluded that speech is immaterial to his retaliation claim. And Plaintiff cites no evidence or authority in connection with that speech either. Notably, this same problem—a failure to cite evidence or authority—also afflicts Plaintiff's argument on the citizen-speech element. (*Id.* at 9–10.)

985 F.3d 1309, 1327 n.16 (11th Cir. 2021); *see Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."). This principle applies here, meaning Plaintiff effectively concedes his speech addressed matters of private interest rather than public interest.

But even if Plaintiff had properly sought to discharge his burden on the public-concern element, the Court does not believe he could have done so. Nothing suggests Plaintiff's personal view of baptism is "a subject of legitimate news interest" or "a matter of political, social, or other concern to the community" (content). *Fleury*, 20 F.4th at 1364; *see Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 504 (5th Cir. 2001) ("[P]ersonal religious conviction . . . simply is not a matter of 'public concern.'"). Plaintiff conveyed his view "to a limited [pool of inmates] rather than the public at large" (form). *Booth*, 757 F.3d at 1215; *see Watts*, 495 F.3d at 1293 (no public concern where plaintiff "provided private counsel to a single patient within the confines of a counseling session"). And he did so inside the workplace, as part of his job, with the purpose of "get[ting] as many folks baptized into Christ as [he] can before Jesus returns" (context).

(Dkt. 60-4 at 3); *see Fiedor v. Fla. Dep't of Fin. Servs.*, 440 F. Supp. 3d 1303, 1311 (N.D. Fla. 2020) (no public concern where plaintiff had "religious conversations . . . . in the workplace" in order to "counsel[]" and "help"). This is a world away from core public concerns like "corruption" and "the misuse of state funds." *O'Neal*, 2022 WL 2921303, at *3; *BMI Salvage Corp. v. Manion*, 366 F. App'x 140, 144 (11th Cir. 2010); *Oladeinde v. City of Birmingham*, 230 F.3d at 1292. And Plaintiff makes no effort to show the concept of public concern stretches far enough to apply.

Given the totality of the record, the Court finds Plaintiff's "communication of his personal religious views . . . is not speech addressing a legitimate public concern." *Daniels*, 246 F.3d at 504; *see Power v. Off. of Chatham Cnty. Pub. Def.*, 2018 WL 3747460, at *7 (S.D. Ga. Aug. 6, 2018) (no public concern where plaintiff "merely expresse[d] a personal belief that, in [her] opinion, the bible condemns gay marriage and homosexuality"). This dooms Plaintiff's claim because "a public employee who does not speak as a citizen on a matter of public concern has no First Amendment cause of action based on his . . . employer's

reaction to the speech." *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 887 (11th Cir. 2006).

### D.    Clearly Established Law

Even if Plaintiff did speak as a private citizen on matters of public concern—meaning his speech was protected—Defendants could reasonably have concluded otherwise.  So qualified immunity applies.

Whether speech is protected under *Pickering* is an "intensely fact-specific legal determination[]," "require[s] ad hoc case-by-case" analysis, and is "not susceptible to bright-line rules."  *Tucker v. Talladega City Sch.*, 171 F. App'x 289, 293 (11th Cir. 2006); *Goffer v. Marbury*, 956 F.2d 1045, 1050 (11th Cir. 1992).  "The cases are, therefore, not good sources for rules of general application."  *Goffer*, 956 F.2d at 1050.  And "a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful."  *Tucker*, 171 F. App'x at 293.

Defendants did not have that notice here.  Plaintiff does not cite, and the Court has not found, any binding precedent involving materially similar facts.  And this is not one of those rare cases where, despite the absence of controlling authority, Plaintiff's speech was so obviously protected that no reasonable official could have concluded otherwise.  *See*

*Coffin*, 642 F.3d at 1015 ("[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."). As explained above, several courts have applied *Pickering* to government volunteers (not just government employees) and hiring decisions (not just decisions about current employees). When a jail minister discusses religion with inmates at his jail, it is at least debatable that he is acting "pursuant to [his] official duties" such that his statements are not protected under *Pickering*. *Alves*, 804 F.3d at 1161; *see Malcolm v. City of Miami Police*, 574 F. App'x 881, 882 (11th Cir. 2014) ("[T]he federal violation must have been beyond debate at the time; otherwise qualified immunity applies."). And several courts have suggested *Pickering* does not protect expressions of personal religious belief because those expressions do not implicate matters of public concern. The Eleventh Circuit has not resolved any of these issues in Plaintiff's favor. And, even if other courts have, that only underscores the lack of clarity in this area and the need for qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges . . . disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy."); *Parrish v.*

*Nikolits*, 86 F.3d 1088, 1094 (11th Cir. 1996) ("[P]laintiffs' argument that the law was clearly established . . . is further undermined by the split of the circuits.").[14]

### E.    Conclusion

Defendants are entitled to summary judgment on Count 2 because Plaintiff has not shown they violated clearly established law when they denied his application to be a volunteer minister at the jail.[15]

---

[14] The Court is aware, for example, that some circuits have suggested religious expression does implicate matters of public concern. *See, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) ("[S]peech concerning religion is unquestionably of inherent public concern."); *Cochran v. City of Atlanta*, 150 F. Supp. 3d 1305, 1313 n.1 (N.D. Ga. 2015) ("The circuits are split as to whether speech is necessarily a comment on a matter of public concern when the content of the speech is religious expression.").

[15] To the extent Count 2 asserts a *free exercise* retaliation claim, Plaintiff does not clearly (1) separate that claim from his *free speech* retaliation claim, (2) argue a different standard applies, (3) spell out that standard, or (4) explain why each element of that standard is met—and met obviously enough to avoid qualified immunity—based on specific citations to evidence and authority. Nor does Plaintiff respond directly to Defendants' assertion that *Pickering* "applies to speech or belief that happens to be religious." (Dkt. 57-3 at 7.) Courts often treat free-exercise and free-speech claims together. *See, e.g.*, *LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 947 (11th Cir. 2022) ("[Plaintiff] references the Free Exercise and Free Speech Clauses in separate claims, but we treat them together."); *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (noting "the Free Exercise and Free Speech Clauses of the First Amendment . . . . work in tandem" and "the Free Speech Clause

## IV. Count 3

In Count 3, Plaintiff Jarrard claims the jail's written policies violated the First Amendment because they gave Defendants "unbridled discretion" over who to appoint as volunteer ministers at the jail. Defendants say qualified immunity bars this claim. Plaintiff does not dispute that Defendants acted within their discretionary authority when they enacted the challenged policies. So, to prevail, Plaintiff must show the policies were clearly unlawful. Plaintiff has not made that showing.

---

provides overlapping protection for expressive religious activities"). And the Eleventh Circuit has applied elements of *Pickering* to free exercise claims. *See Shahar v. Bowers*, 114 F.3d 1097, 1111 n.27 (11th Cir. 1997). But the Supreme Court has declined to address "whether the Free Exercise Clause may sometimes demand a different analysis" when it comes to *Pickering's* threshold requirement for "private speech on a matter of public concern." *Kennedy*, 142 S. Ct. at 2425 n.2. That is, while the Free Speech Clause protects government employee speech only if the employee spoke as a private citizen on matters of public concern, "[i]t remains an open question . . . if a similar analysis can or should apply to free-exercise claims in light of the history and tradition of the Free Exercise Clause." *Id.* at 2433 (Thomas, J. concurring); *see Fiedor v. Fla. Dep't of Fin. Servs.*, 440 F. Supp. 3d 1303, 1311 (N.D. Fla. 2020) (suggesting "[t]he principles derived from *Pickering* for the Freedom of Speech Clause apply also to the Free Exercise Clause, but with a twist"). Plaintiff gets into none of this. And the Court declines to do it for him. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments."). Plaintiff has abandoned any claim for free exercise retaliation that is not otherwise barred by the Court's adjudication of his free speech claim.

Over the years, the Polk County Sheriff Office has repeatedly revised its written policy governing the application and approval process for volunteer jail ministers. An early version of the policy was only a sentence long: "Clergymen and religious advisors wishing to hold services or conduct programs in the jail must make written application to the Polk County Sheriff's Office with supporting documentation, attend a training session and then be approved by the Jail Administrator." (Dkt. 53-4 at 2.) A later version included more detail:

> The Polk County Sheriff's Office encourages Clergy from the community to minister to the inmates. Clergymen and religious advisors wishing to hold services or conduct programs in the jail must submit a volunteer application. Members of the clergy allowed within the inner security perimeter or allowed contact visitation, must complete background checks, including the jail ministry program.

(Dkt. 53-5 at 3.) Plaintiff applied to be a jail minister under both policies. And, both times, Defendants denied his request.

Plaintiff claims the policies were unconstitutional because they "provide[d] no standards for the exercise of any discretion, and no time limits for decision-making, thus allowing for arbitrary decisions or decisions based on the religious preferences of jail administrators." (Dkt. 53 ¶ 87.) This argument is based on the "unbridled-discretion doctrine,"

which makes it unlawful to "vest[] unbridled discretion in a government official over whether to permit or deny expressive activity" in a government forum. *Tracy v. Fla. Atl. Univ. Bd. of Trustees*, 980 F.3d 799, 809 (11th Cir. 2020). Such discretion "is constitutionally suspect because it creates the opportunity for undetectable censorship and signals a lack of narrow tailoring." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1256 (11th Cir. 2004). To avoid this risk, the government must issue "narrowly drawn, reasonable, and definite standards to guide the official's decision." *Tracy*, 980 F.3d at 809. Those standards should include a "time limit within which [the official] must make a decision" on any application to speak in the forum. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1222 (11th Cir. 2017).

Defendants' jail policies arguably violated this rule. But the Court cannot say that violation was obvious enough to defeat qualified immunity. Neither the Supreme Court nor the Eleventh Circuit has ever applied the unbridled-discretion doctrine on facts like these. And it is not clear they would. "The unbridled discretion doctrine is usually reserved for permitting schemes" that "require individuals to obtain permission before engaging in speech activities." *LaCroix*, 38 F.4th at 953; *Tracy*,

980 F.3d at 809 ("The unbridled-discretion doctrine generally applies to licensing or permitting schemes."). What we have here does not comfortably fit that description. Instead, on at least one reasonable view of the facts, Defendants' policies are more akin to a set of *hiring* procedures. *See Freeman v. Sample*, 814 F. App'x 455, 462 n.1 (11th Cir. 2020) ("[T]he protection of qualified immunity extends to mistakes in judgment, whether the mistake is one of fact or one of law."). Plaintiff cites no authority for applying unbridled-discretion principles in that context. The most he claims is that "permitting cases provide a close fit." (Dkt. 70-2 at 21.) But, even if that were true, qualified immunity would still apply because "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Washington v. Rivera*, 939 F.3d 1239, 1245 (11th Cir. 2019). A reasonable official could believe the permitting/hiring distinction mattered. *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) ("Minor variations in some facts . . . might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents.").

Another thing that makes this case different is the venue. The challenged policies regulated admission into a jail, a uniquely sensitive nonpublic forum. *See McDonald v. City of Pompano Beach, Fla.*, 556 F. Supp. 3d 1334, 1352 (S.D. Fla. 2021) (noting jails are nonpublic forums). Plaintiff cites no controlling authority saying unbridled-discretion principles apply to that forum. He relies on *Barrett* but that case focused on "limited public fora," which the court expressly distinguished from "nonpublic fora." *See Barrett*, 872 F.3d at 1225–26. *Barrett* also clarified that, while earlier unbridled-discretion cases claimed to involve nonpublic forums, they actually involved limited public forums. *Id.* So *Barrett* does not conclusively resolve whether unbridled discretion principles apply to nonpublic forums at all, much less to jails specifically.

Although this is a thorny area of law, the outcome here is relatively straightforward. A reasonable official could think the unbridled-discretion doctrine does not apply to a jail's policies and procedures for appointing volunteer ministers. So Defendants did not violate clearly

established law by enacting the policies here.  Qualified immunity bars Count 3.[16]

## V.    Conclusion

Plaintiff Jarrard's Motion for Partial Summary Judgment (Dkt. 56) is **DENIED**.  Defendants' Motion for Summary Judgment as to Plaintiff Jarrard's Claims (Dkt. 57) is **GRANTED**.  Defendants' Motion for Summary Judgment as to Plaintiff Morris's Claim (Dkt. 58) is **GRANTED IN PART** and **DENIED IN PART**.  Count 1 can proceed against Defendants Sharp and Moats, but not against Defendant Strop. Counts 2–3 cannot proceed.  The Court **DISMISSES** this action as to Defendant Strop.

The Court **ORDERS** this case to mediation.  The parties may retain a private mediator at their own expense.  Or they may ask the Court to appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

---

[16] Count 3 also claims the jail ministry application form "contains rules that are vague, overbroad, and amount to viewpoint discrimination, such as 'DON'T TAKE SIDES AGAINST AUTHORITY.'"  (Dkt. 53 ¶ 88.)  The Court dismissed this claim at the motion-to-dismiss stage.  (Dkt. 34 at 34 n.11.)  And the Court sees no reason to revisit that ruling now.  Qualified immunity bars the claim.

The parties shall advise the Court of their mediation preference no later than 30 days after the date of this Order. If the parties elect to retain their own mediator, they shall identify the mediator no later than 45 days after the date of this Order. Mediation must occur within 90 days after the date of this Order. The parties must have present at the mediation a person with authority to settle this litigation. The parties shall file a report on the outcome of their mediation no later than 7 days after the mediation concludes.

The Court **STAYS** this case pending mediation. The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 27th day of September, 2022.



_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE